UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHRISTOPHER HARRISON                    CIVIL ACTION

VERSUS                                  NO: 07-417

DIAMOND OFFSHORE DRILLING,              SECTION: R(1)
INC.


**ORDER AND REASONS**

The Court held a two-day bench trial on plaintiff's claims
of negligence under the Jones Act, 46 U.S.C. § 30104(a), and
unseaworthiness under the general maritime law against Diamond
Offshore Management Company and Diamond Offshore Services Company
from January 28-29, 2008. This Court has original jurisdiction
over this matter pursuant to the Jones Act, 46 U.S.C. § 30104(a),
and the Court's admiralty jurisdiction under 28 U.S.C. § 1333.
The substantive law applicable to this case is prescribed by the
Jones Act and general maritime law of the United States. After
hearing live testimony and reviewing all the evidence, the Court
rules as follows. To the extent a finding of fact constitutes a
conclusion of law, the Court adopts it as such. To the extent a

conclusion of law constitutes a finding of fact, the Court adopts it as such.


I.    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    A.    **Background**

        Plaintiff Christopher Harrison brought this action under the Jones Act and general maritime law as a result of lower back injuries that he sustained when a stanchion post fell on him on May 19, 2005 when he worked as a roustabout for defendant Diamond Offshore Management Company, aboard co-defendant Diamond Offshore Service Company's offshore drilling rig, the *Ocean Champion*.[1] (For simplicity the Court refers to the two affiliated corporate defendants as Diamond.) Harrison began to work as a roustabout for Diamond Offshore Management in May 2005. As a roustabout, Harrison worked two-week hitches aboard the *Ocean Champion* with two weeks off between each hitch. He stopped working for Diamond in mid-to-late July 2005, two months after his accident.[2] Before he worked for Diamond, Harrison held four different jobs. After high school, he served nine years in the United States Navy and was honorably discharged.[3] In the Navy, Harrison first worked as

---

[1] Pretrial Order at 2, 8.

[2] *Id.* at 8.

[3] *Id.*; Pl.'s Ex. 19, U.S. Navy Employment Records for Christopher Harrison; Testimony of Christopher Harrison.

a firefighter on an amphibious assault ship that carried
helicopters. He ended his naval career as a recruiter in
Alabama.[4] Between his military service and his employment by
Diamond, Harrison worked as a security guard on a United States
Army base for one day and then as a forklift operator, first for
a trailer manufacturing company and later, for a food
distribution company.[5] Since his discharge from the Navy,
Harrison has served in the Naval Reserve and participated in
monthly training exercises. Harrison is 30 years old and resides
in Elba, Alabama, with his wife of five years and their four-year
old son. He was 28 at the time of the accident.

**B.   Harrison's Previous Injuries**

Before he began to work for Diamond, Harrison was involved
in two motor-vehicle accidents for which he sought medical
treatment. The first accident occurred in April 2000, when
Harrison fell off of his all-terrain vehicle (ATV).[6] Medical
records from Harrison's hospital visit for this accident show
that he did not suffer any broken bones and that "vertebral body

---

[4] Testimony of Christopher Harrison.

[5] *Id.*

[6] *Id.*

3

heights and disc spaces [in his back] appear well maintained."[7]
Then, on August 26, 2002, Harrison was involved in a motorcycle
accident in which he injured one of his ankles, broke a finger,
and suffered cuts and bruises.[8] Harrison spent three days in the
hospital for these injuries.[9] At the time of the accident,
Harrison did not report any back pain, and his medical records do
not indicate that he suffered any back injuries from the crash.[10]
Further, Harrison testified that he did not experience any lower
back pain as a result of this accident.[11] A couple of weeks after
the accident, Harrison returned to the hospital with complaints
of pain in his upper right shoulder, but he denied any pain in
his lower back.[12] Harrison testified that he recovered from both
of these accidents without any lingering injuries or pain.[13]

---

[7] Defs.' Ex. 27: Radiological Consultation Report of Dr.
Vincent E. Martin, Apr. 1, 2007 .

[8] Testimony of Christopher Harrison; Defs.' Ex. 23: "Medical
Center Enterprise, DRG Worksheet."

[9] Testimony of Christopher Harrison.

[10] Def.'s Ex. 23: Aug. 26, 2002 "Pain Assessment"; Def.'s Ex.
23: Aug. 26, 2002 "Radiological Consultation Request" (stating
with respect to Harrison's cervical and lumbar vertebrae that
"vertebral body heights and disc space appear maintained" and no
listhesis or fracture was present).

[11] Testimony of Christopher Harrison.

[12] Testimony of Christopher Harrison; Defs.' Ex. 23.

[13] Testimony of Christopher Harrison.

4

After hearing testimony and reviewing Harrison's medical records from these two accidents, the Court finds that, contrary to Diamond's assertions,[14] there is no evidence that Harrison suffered lower back injuries as a result of these accidents.

### C.   Diamond Offshore Management's Pre-Employment Procedures

Before Harrison began to work for Diamond as a roustabout, Diamond required Harrison to undergo a pre-employment physical examination. On April 1, 2005, Harrison was examined by doctors at Occupational Medical Center of West Jefferson in Marrero, Louisiana, at the request of Diamond. As part of his pre-employment physical, Harrison completed a "Back Screening Questionnaire" in which he answered "No" to each of the following questions:

1.   Do you have a history of back surgery?

2.   Do you have any weakness in your lower extremities?

3.   Do you have any sensory changes such as numbness/tingling in your lower extremities?

4.   Do you have a history of trauma involving your back?

5.   Do you have any problems involving your bowel or bladder?

6.   Do you presently have back pain?[15]

_____

[14] Defs.' Proposed Findings of Fact and Conclusions of Law at ¶¶ 8, 9.

[15] Pl.'s Ex. 4: April 1, 2005 Back Screening Questionnaire.

5

Diamond asserts that Harrison was untruthful because he did not disclose that he had been in the 2002 motorcycle accident and the 2000 ATV accident. The questionnaire, however, did not ask him whether he had been involved in any earlier accidents. In addition, the "Certificate of Medical Examination" signed by Harrison and Dr. Raymond Wei suggests that Harrison had disclosed the injuries he suffered from the 2002 motor cycle accident. It notes that he had surgery on his left hand in 2002 to repair the broken finger that he suffered.[16] Most significantly, Diamond had Harrison undergo an MRI scan as part of his pre-employment screening. That scan revealed to Diamond that Harrison had a dessicated disc and global bulging disc at the L5-S1 level.[17] Nevertheless, Dr. Brian Bourgeois, Diamond's medical examiner, certified that Harrison met the physical requirements to work as a roustabout.[18]

### D.   Harrison's Roustabout Training

After Diamond hired Harrison, Harrison underwent seven days of training at the end of April 2005 aboard the *Mr. Charlie*, a

---

[16] Pl.'s Ex. 4: April 1, 2005 "Certificate of Medical Examination."

[17] Pl.'s Ex. 3: April 1, 2005 MRI of Louisiana Lumbar Spine Screen.

[18] Pl.'s Ex. 3: Diamond Offshore, Physical Examination Form signed by Dr. Brian Bourgeois, Apr. 4, 2005.

Diamond training vessel.[19] Harrison testified that instructions on work safety comprised a significant part of his roustabout training and that his instructors stressed the importance of not leaving work areas in a hazardous condition that could result in injury to other employees.[20] After Harrison completed his roustabout training, he was deployed to the *Ocean Champion* for a two-week hitch beginning on May 18, 2005. On his first shift aboard the *Ocean Champion*, Harrison completed various light cleaning tasks such as sweeping.[21]

**E.   The May 19, 2005 Accident**

At the start of his shift on May 19, 2005, Harrison was assigned to sweep the pipe rack bays on the deck of the *Ocean Champion* as the rig prepared to take on drill pipe and casings.[22] Pipe rack bays are open areas on the deck of the rig where casing or drilling pipes are stored after being loaded onto the rig.[23] A catwalk bisects the bays, and the bays themselves are divided into rectangular areas by metal "I-Beams" that are nine and a

---

[19] Testimony of Christopher Harrison.

[20] *Id.*

[21] *Id.*

[22] *Id.*; Testimony of Carl Knippers; Defs.' Ex. 1: Injury Report.

[23] Dep. of Alton Harvey at 27-28.

half inches high and just under one foot wide.[24] When pipes are
stored in the bays, they rest lengthwise on top of the I-Beams.[25]
Stanchion posts act as braces to stabilize the large drilling
pipes that are stacked in the bays, similar to the way that
bookends function. A typical stanchion post on the *Ocean Champion*
is a six-foot tall metal cylinder approximately six inches in
diameter that is welded to one end of a four-foot by one-foot
rectangular metal base plate, forming an "L" shape.[26] The base
plate fits over the top of an I-Beam and can be moved over the
beam like rail wheels on a track.[27] Four bolts, two at each end
of the base plate, may be tightened underneath the top lip of the
I-Beam to hold the stanchion in place.[28] Some stanchions on the
*Ocean Champion* are also fitted with "extension stops." Extension
stops are four-foot cylinders that slide roughly one foot into
the top of the stanchion post and are secured with a cross-bolt,

---

[24] Defs.' Ex. 12: Diagram of Stanchion Post and I-Beam.

[25] Defs.' Ex. 12-001.jpg: Photograph of Pipe Rack Bay; Dep.
Ricky Frazier at 26, Pl.'s Ex. 35.

[26] Defs.' Ex. 12: Diagram of Stanchion Post and I-Beam and
Photographs; Testimony of Christopher Harrison; Testimony of Carl
Knippers; Dep. of Alton Harvey at 19.

[27] Dep. of Ricky Frazier at 27; Dep. of Alton Harvey at 25.

[28] Defs.' Ex. 12: Diagram of Stanchion Post and I-Beam and
Photographs; Testimony of Christopher Harrison; Testimony of Carl
Knippers; Dep. of Ricky Frazier at 26; Dep. of Alton Harvey at
19.

making a stanchion post fitted with an extension approximately nine-feet high.[29]

While Harrison was moving between pipe rack bays, a stanchion post with an extension fell on his back.[30] Harrison was carrying a broom and dustpan in one hand, and he touched a nearby stanchion post with his other hand to steady himself when he moved from one bay to another.[31] As he stepped over the I-Beam dividing the bays, the post fell across his back. Harrison dropped his broom and pan and twisted his body around to catch the falling post, contorting his back in the process.[32] Three supervisory crew members, Carl Knippers, Alton Harvey and Ricky Frazier, who were having a conversation nearby, noticed that the stanchion had collapsed on Harrison.[33]  The three men rushed to Harrison's aid, and Knippers, who reached Harrison first, helped Harrison right the stanchion post and reposition it on the I-

---

[29] Defs.' Ex. 12: Diagram of Stanchion Post and I-Beam and Photographs; Testimony of Christopher Harrison; Testimony of Carl Knippers.

[30] Testimony of Christopher Harrison; Testimony of Carl Knippers; Defs.' Ex. 1: Injury Report.

[31] Testimony of Christopher Harrison Dep. of Alton Harvey at 13.

[32] Testimony of Christopher Harrison.

[33] Testimony of Christopher Harrison; Testimony of Carl Knippers; Dep. of Ricky Frazier at 23-25; Dep. of Alton Harvey at 13-14.

Beam.[34] Harrison and Frazier estimated that the post weighed approximately 150 pounds.[35] After the stanchion post was back in place atop the I-Beam, Knippers and Frazier discovered that only one bolt was threaded into the base plate of the stanchion post.[36] Alton Harvey, a 28-year employee of Diamond and the crane operator when the accident occurred, testified that after Harrison and Knippers repositioned the stanchion on the I-Beam, other rig personnel then bolted the stanchion to the beam.[37]

### F.   Harrison's Jones Act Negligence Claim

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). The fundamental duty of a Jones Act employer is to provide its seaman employees with a reasonably safe place to work. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989). In *Gautreaux*, the Fifth Circuit, sitting *en banc*, clarified that an employer is liable under the Jones Act if the negligence of its employees or agents played "any part, even the slightest" in

---

[34] Testimony of Christopher Harrison.

[35] *Id.*; Dep. of Ricky Frazier at 29.

[36] Testimony of Christopher Harrison; Testimony of Carl Knippers; Dep. of Ricky Frazier at 27.

[37] Dep. of Ricky Frazier at 38; Dep. of Alton Harvey at 25.

causing the injury or death for which damages are sought. *Id.*
(citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506
(1957)). At the same time, the employer's standard of care is not
greater than that of ordinary negligence under the circumstances.
*Id.* at 339. In addition, the seaman's duty of care is not a
"slight" duty of care to protect himself from the employer's
negligence. *Id.* Rather, the seaman is also obliged to act "with
ordinary prudence under the circumstances," which includes the
seaman's reliance on his employer to provide a safe working
environment and the seaman's own experience, training, or
education. *Id.*

Here, Diamond was negligent because its employees on a shift
before Harrison's failed to securely fasten the stanchion post
that fell on Harrison. Frazier testified that the stanchion post
was supposed to be fastened to the adjoining I-Beam by four bolts
threaded through the stanchion post base-plate, extending
underneath the top lip of the I-Beam so that the bolts would
prevent the I-Beam from tipping too far in one direction or
another.[38] Knippers, Harvey, and Frazier confirmed that the
crewmembers who were last working with the stanchion in the pipe
rack bays were responsible for securing the stanchion to the I-
Beam, and further that a roustabout assigned to sweep the pipe

---

[38] Dep. of Ricky Frazier at 43.

rack bays such as Harrison would not be responsible for inspecting the stanchion to ensure that it was securely fastened.[39] Accordingly, the Court finds that Diamond was negligent because it failed to provide Harrison a reasonably safe place to work.

Diamond incorrectly asserts that Harrison was contributorily negligent in causing the stanchion post to topple off of the I-Beam. Knippers, a 26-year employee of Diamond and the Offshore Installation Manager (OIM) chiefly responsible for operations on the *Ocean Champion* at the time, and Frazier, the deck coordinator at the time of the accident and Harrison's immediate supervisor, testified that, in their view, Harrison did nothing wrong by placing one hand against the stanchion post to stabilize himself as he stepped over the I-Beam with a broom and dustpan in his other hand.[40] Harrison, who had worked as a roustabout for only one full day before the accident occurred, offered unrebutted testimony that he had not received instructions on stanchion posts during his roustabout training, nor any warning during his

---

[39] Testimony of Carl Knippers; Dep. of Alton Harvey at 31-32; Dep. of Ricky Frazier at 43.

[40] Testimony of Carl Knippers; Dep. of Ricky Frazier at 41-43.

pre-shift coordination meeting that the stanchion post was not securely fastened to the I-Beam.[41]

Diamond's assertion that Harrison must have applied significant force to the stanchion post lacks evidentiary support. Diamond offered no proof of the amount of force it would take to tip over a nine-foot tall, 150-pound stanchion post resting on a base only a foot wide that was neither properly bolted to the adjacent I-Beam, nor flush with the surface on which it was resting. Nor did it offer any proof that the post could not have collapsed as a result of Harrison's steadying himself against it. Both Frazier and Harvey confirmed that an individual could cause an unbolted stanch post to fall over on its side and that had the post been properly bolted, it would not have collapsed.[42] For example, Frazier testified that if the stanchion post "had been bolted, it wouldn't have [fallen] over."[43] Harvey testified that the bolts were responsible for holding the stanchion post in place. When the bolts are screwed through the plate so that they pass underneath the top lip of the

_____

[41] Testimony of Christopher Harrison.

[42] Dep. of Ricky Frazier at 28-29; Dep. of Alton Harvey at 38.

[43] Dep. of Ricky Frazier at 29.

13

I-Beam, they keep the stanchion from rolling off the beam.[44]
Harvey testified that "most of the time" if an individual were to
push against a stanchion post, he would be unable to push it over
"because the bolts catch it."[45] It is the bolts' catching against
the underside of the I-Beam that prevents the stanchion from
"tilting over," Harvey testified.[46] The testimony of Frazier and
Harvey that the stability of the stanchion depends on the bolts
being secured undercuts Diamond's contention that Harrison
carelessly pushed or pulled the post on top of himself. It is
undisputed that the stanchion post was not properly bolted to the
I-Beam. In light of this fact and the statements of experienced,
supervisory employees that Harrison did nothing wrong by touching
the post to steady himself, the Court does not find that Harrison
was contributorily negligent when the stanchion post fell on him.

### G.   Harrison's Unseaworthiness Claim

To establish a claim for unseaworthiness, "the injured
seaman must prove that the owner has failed to provide a vessel,
including her equipment and crew, which is reasonably fit and
safe for the purposes for which it is used. In addition, the
plaintiff must establish a causal connection between his injury

---

[44] Dep. of Alton Harvey at 48.

[45] *Id.* at 37.

[46] *Id.* at 48.

and the breach of duty that rendered the vessel unseaworthy."
*Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002)
(citing *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).
A vessel's unseaworthiness may arise from various circumstances,
including defective gear, appurtenances in disrepair, an unfit
crew, an improper method of loading cargo, or an insufficient
number of workers assigned to perform a shipboard task. *See Usner
v. Luckenbach Overseas Corp.*, 400 U.S., 494, 499 (1971). A
plaintiff asserting a claim of unseaworthiness need not establish
negligence, but bears the burden of showing that the unseaworthy
condition "played a substantial role in bringing about or
actually causing the injury and that the injury was either a
direct result or a reasonably probable consequence of the
unseaworthiness." *Phillips v. Western Co. of N.A.*, 953 F.2d 923,
928 (5th Cir. 1992). "[D]angerous and uncertain conditions
underfoot may constitute transitory unseaworthiness." *Shenker v.
United States*, 322 F.2d 622, 626 (2d Cir. 1963).

As discussed, *supra*, the stanchion post that fell on
Harrison was supposed to be securely fastened to the I-Beam by
four bolts. It was not. Harrison's supervisors testified that the
stanchion posts are integral to the process of loading and
storing drill pipe and casing in safe manner.[47] The evidence

---

[47] Testimony of Carl Knippers; Dep. Testimony of Ricky
Frazier; Dep. of Alton Harvey.

shows that because the stanchion was not secured properly it fell across Harrison's back and that he contorted his body to prevent the post's complete collapse. Therefore, the Court finds that the stanchion post that fell on him was in an unseaworthy condition.

## H.   Extent and Causation of Harrison's Injuries

Harrison claims that as a result of the May 19, 2005 accident, he sustained injuries to his back that ultimately required him to undergo lower spinal fusion surgery. He also contends that he has developed neurogenic bladder and bowel disorder and neurogenic erectile dysfunction as a result of the accident. Harrison also contends that he has become increasingly depressed and despondent, rendering him unable to return to work. The Court finds that the collapse of the stanchion post at least aggravated Harrison's herniated disc condition. The Court concludes, however, that Harrison has failed to carry his burden of showing that he suffers bladder, bowel, and erectile problems as a result of the accident. The Court further concludes that Harrison has failed to prove with reliable evidence that he suffered from depression attributable to the accident.

### 1.   Harrison's Lower Back Injuries

Although Harrison had a preexisting back condition before the May 19, 2005 accident, he testified that it was

16

asymptomatic.[48] His wife corroborated Harrison's testimony.[49] Indeed, with knowledge of Harrison's MRI results, Diamond certified him as able to work offshore. The parties disagree as to whether Harrison complained of any lower back pain on the day of the accident or before he completed an injury report on May 27, 2005.[50] Harrison testified that he notified both Frazier, his immediate supervisor, and Harvey, who supervised Frazier and the other roustabouts, that he was experiencing back pain.[51] Harrison further testified that Harvey remarked that if Harrison was hurt in the accident, then he "wouldn't make it on the oil rig."[52] Harrison interpreted this remark as a "threat" and decided to try to work through his pain to avoid making a bad impression as a new employee. Frazier and Harvey did not recall Harrison's complaining of back pain after the accident, and Harvey denied ever discounting any complaint of injury by Harrison. The Court credits Harrison's testimony because the circumstances of the accident (*i.e.*, having a 150-pound post fall on him) would likely

---

[48] Testimony of Christopher Harrison.

[49] Testimony of Kayla Harrison.

[50] Pl.'s Ex. 1: Diamond Offshore Drilling, Inc., Injury or Illness Report, Incident No. 146050012, May 27, 2005.

[51] Testimony of Christopher Harrison.

[52] *Id.*

result in pain, and Harrison had a specific recollection of his two conversations.

In any event, when Harrison completed an injury report about the accident six days later, Diamond took his complaint seriously. It airlifted Harrison via helicopter from the rig in the Gulf of Mexico to West Jefferson Hospital. There, Dr. Brian Bourgeois, the same doctor who cleared Harrison for work, examined Harrison.[53] Harrison returned to the *Ocean Champion* the following day under instructions from Dr. Bourgeois that he be restricted to "light duty" and return for a follow-up appointment after completing his hitch.[54] Harrison then completed his first two-week hitch aboard the *Ocean Champion*.[55]

On June 1, 2005, on his way home to Alabama for his two-week break, Harrison reported to Dr. Bourgeois for his follow-up visit. Dr. Bourgeois noted that Harrison could extend and raise his legs fully and that Harrison did not exhibit signs of radicular pain in his legs. Dr. Bourgeois released Harrison with the restriction that he lift no more than 25 pounds and not

---

[53] *Id.*; Pl.'s Ex. 4: Medical Examination Form signed by Dr. Brian Bougeois, May 27, 2005.

[54] Testimony of Christopher Harrison; Pl.'s Ex. 4: Doctor's Findings and Disposition signed by Dr. Brian Bourgeois, May 27, 2005.

[55] Testimony of Christopher Harrison.

18

engage in repeated bending, stooping, squatting, pushing, jerking, twisting, or bouncing.[56] He also noted that Harrison could continue with moderate to light duty with a slow increase in physical demands and directed Harrison to return for another evaluation before starting his second hitch in two weeks.[57] Harrison testified that during his two-week break, he was not able to engage in much physical activity because of his persistent back pain.[58] On June 15, 2005, before embarking on his second hitch aboard the *Ocean Champion*, Harrison was examined by Dr. Bourgeois again and underwent another MRI. That MRI showed that Harrison had two herniated discs at L4-L5 and L5-S1. Dr. David Hunter noted that the MRI showed "a small central posterior L4-L5 disc protrusion" and a "more prominent central posterior abnormal focal convexity, consistent with a midline contained disc extrusion or a focal disc protrusion" between Harrison's L5-S1 vertebrae.[59] Dr. Hunter also noted that these disc protrusions

---

[56] Pl.'s Ex. 4: Work Status Report signed by Dr. Brian Bourgeois, June 1, 2005.

[57] Pl.'s Ex. 4: Occupational Medicine Center of West Jefferson, Examination Notes signed by Dr. Brian Bourgeois, June 1, 2005; Pl.'s Ex. 4: Work Status Report signed by Dr. Brian Bourgeois, June 1, 2005.

[58] Testimony of Christopher Harrison.

[59] Pl.'s Ex. 4: MRI Report of Dr. David R. Hunter, MRI of Louisiana, June 15, 2005.

were "without neural impingement."[60] On July 8, 2005, Dr.
Bourgeois examined Harrison at another follow-up visit at which
Harrison complained of persistent pain.[61] This time he
recommended that Harrison be restricted to "onshore/sedentary
duty" because of his back disc injury as opposed to moderate to
light duty as he had recommended earlier.[62] Dr. Bourgeois also
prescribed physical therapy sessions for Harrison three times per
week for two weeks, which Harrison underwent at an orthopedic
clinic near his home in Alabama, and directed him to return for
another follow-up visit in two weeks.[63] At Harrison's next visit
on July 21, 2005, Dr. Bourgeois recommended again that Harrison
be restricted to onshore/sedentary work.[64] He also noted that
Harrison's pain was unchanged from earlier visits and that
Harrison might require an epidural.[65] At some point in late July

_____

[60] Pl.'s Ex. 4: MRI Report of Dr. David R. Hunter, MRI of
Louisiana, June 15, 2005.

[61] Pl.'s Ex. 4: Examination Notes signed by Dr. Brian
Bourgeois, July 8, 2005.

[62] Pl.'s Ex. 4: Work Status Report signed by Dr. Brian M.
Bourgeois, July 8, 2005.

[63] Testimony of Christopher Harrison; Pl.'s Ex. 2: Interview
of Christopher Harrison by David Ellingburg of Diamond's Claims
Dep't, July 19, 2005.

[64] Pl.'s Ex. 4: Work Status Report signed by Dr. Brian M.
Bourgeois, July 21, 2005.

[65] Pl.'S Ex. 4: Examination Notes signed by Dr. Brian
Bourgeois, July 21, 2005.

2005, Harrison terminated his employment with Diamond and began to receive maintenance and cure payments.

On August 10, 2005, Harrison sought medical treatment from Dr. Bradley Bartholomew, a neurosurgeon, at Dr. Bartholomew's New Orleans office.[66] Harrison described to Dr. Bartholomew the circumstances of the accident, the back pain that he experienced after the accident, and the treatment that he had received from Diamond's doctors.[67] The day before he reported to Dr. Bartholomew, Harrison underwent a third MRI scan. Based on that MRI and his examination of Harrison, Dr. Bartholomew diagnosed Harrison as having herniated discs at L4-L5 and L5-S1.[68] Dr. Bartholomew ultimately concluded that the May 19, 2005 accident caused Harrison's injury based on Harrison's history, his progressively worsening pain since the accident, and clinical test results.[69] At Harrison's August 10, 2005 visit, Dr. Bartholomew noted that Harrison's pain was constant, growing worse when he stood or sat for long periods, that Harrison experienced pain down his left leg in the thigh and calf region,

[66] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Aug. 10, 2005.

[67] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Aug. 10, 2005.

[68] Testimony of Dr. Bradley Bartholomew.

[69] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Oct. 16, 2007.

and that he had experienced numbness in his entire left foot that persisted in his left big toe.[70] Dr. Bartholomew recommended that Harrison undergo an electromyogram and nerve conduction study (EMG/NCS) to test the extent of any nerve damage, and he prescribed painkillers and the use of a transcutaneous electrical nerve stimulator (TENS unit) or home stimulator.[71] Dr. Bartholomew also opined that based on the August 9, 2005 MRI, his examination, and his finding that Harrison's condition had worsened in the three months since being injured in the accident, Harrison would likely require surgery.[72]

On October 26, 2005, Dr. Morteza Shamsnia, a neurologist, examined Harrison at the Advanced Neurodiagnostic Center in Metairie, Louisiana. She performed the EMG/NCS that Dr. Bartholomew recommended. Dr. Shamsnia concluded that Harrison displayed abnormal reactions to electrical stimulations that were "consistent with left L5 radiculopathy."[73]

---

[70] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Aug. 10, 2005.

[71] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Aug. 10, 2005.

[72] Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Aug. 10, 2005; Testimony of Dr. Bradley Bartholomew at 6.

[73] Pl.'s Ex. 6: Neurology Progress Note signed by Dr. Morteza Shamsnia, Aug. 26, 2005.

On November 10, 2005, Harrison returned for a second visit with Dr. Bartholomew. Dr. Bartholomew examined Harrison again and noted that straight leg raising produced bilateral back pain and that Harrison continued to have low sensation in his left big toe.[74] At this appointment, Dr. Bartholomew discussed various treatment options with Harrison, including steroid injections and a lumbar fusion.[75] Dr. Bartholomew concluded that surgery, as opposed to less-invasive, palliative treatment such as steroid injections, was necessary because Harrison described his back pain as growing progressively worse after the accident and his sensory and motor exams showed abnormalities.[76] After his consultation, Harrison telephoned Dr. Bartholomew to let him know that he was interested in having the spinal fusion.[77]

On December 13, 2005, Dr. Christopher Cenac, an orthopedic surgeon in Houma, Louisiana, performed an independent medical examination (IME) on Harrison at the request of Diamond.[78]

---

[74] Pl.'s Ex. 5: Clinic Note signed by Dr. Bradley Bartholomew, Nov. 11, 2005.

[75] Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Clinic Note signed by Dr. Bradley Bartholomew, Nov. 11, 2005.

[76] Testimony of Dr. Bradley Bartholomew.

[77] Testimony of Christopher Harrison; Testimony of Dr. Bradley Bartholomew; Addendum to Clinic Note signed by Dr. Bradley Bartholomew, Aug. 11, 2005.

[78] Testimony of Dr. Christopher Cenac; Defs.' Ex. 16: Cenac Ltr., Dec. 13, 2005.

Similar to Dr. Bartholomew's findings, Dr. Cenac noted that
Harrison had sensory deficits in the L5 and S1 nerve distribution
in his left foot. Dr. Cenac performed a straight leg raising test
on Harrison in which Harrison exhibited no signs of tension. He
also performed motion tests on Harrison's back in which Harrison
exhibited a normal range of motion.[79] Dr. Cenac reviewed images
from the August 9, 2005 MRI, the EMG/NCS study of October 26,
2005, and the reports, but not the images, of the April 1 and
June 15, 2005 MRIs.[80] Dr. Cenac agreed that Harrison suffered
disc protrusions at L4-L5 and L5-S1, but he concluded that
Harrison's condition was degenerative based on the lack of an
acute bulge.[81] Dr. Cenac found no compression of the nerve root
at either L4-L5 or L5-S1, but he did conclude that Harrison
suffered some dermatomal sensory deficits associated with nerve
damage at L-5 and agreed that the EMG/NCS results suggested a
"left L5 radiculopathy."[82] Dr. Cenac concluded, however, that
Harrison had likely not suffered an "acute structural injury" to
his spine because MRI results from before and after the accident

---

[79] Testimony of Dr. Christopher Cenac.

[80] Testimony of Dr. Christopher Cenac; Defs.' Ex. 15: Cenac
Ltr. Dec. 13, 2006.

[81] Testimony of Dr. Christopher Cenac.

[82] Defs.' Ex. 16: Cenac Ltr., Dec. 13, 2006.

were largely the same. He also concluded that Harrison's back
condition was likely degenerative because the MRI reports made no
mention of "bright signals" during the scans, which are usually
indicative of an acute disc herniation resulting from a traumatic
injury.[83] Dr. Cenac concluded that Harrison suffered a "temporary
aggravation of a pre-existing ongoing condition."[84] A month
later, Dr. Cenac compared the actual images of Harrison's April
1, June 15, and August 9, 2005 MRIs. He reached the same
conclusion as he had on December 13, 2005. Dr. Cenac opined that
these images did not demonstrate a change in Harrison's back
condition from before the accident. He also noted that the April
1, 2005 MRI revealed a "minimal bulge at L4-L5," although
Harrison's pre-employment MRI results did not mention that bulge
and the L4-L5 bulge was clearer on later MRIs.[85] Dr. Cenac also
noted that none of the MRIs showed signs of spinal cord
compression or nerve root impingement.[86] The following month, in
response to a query from Diamond, Dr. Cenac opined that Harrison
had reached maximum medical improvement as of December 13,

---

[83] Testimony of Dr. Christopher Cenac.; Defs.' Ex. 16: Cenac
Ltr., Dec. 13, 2006.

[84] *Id.*

[85] Defs.' Ex. 16: Cenac Ltr., Jan. 10, 2006.

[86] *Id.*

2005.[87] Dr. Cenac, however, did confirm at trial that the May 19, 2005 accident most likely aggravated Harrison's preexisting back condition.[88] And he could not say with any certainty how long a temporary aggravation of a previously asymptomatic condition could continue to be symptomatic.[89]

On January 10, 2006, Harrison reported to Dr. Bartholomew for a third visit. Dr. Bartholomew again noted that Harrison complained of pain and tingling extending the length of his left leg to his left big toe and that decreased sensation in that toe persisted.[90] Dr. Bartholomew also compared Harrison's three MRI scans and noted, as Dr. Cenac had, that the April 1, 2005 scan revealed slight disc dessication at L4-L5 as well as a herniation at L5-S1.[91] And like Dr. Cenac, Dr. Bartholomew also concluded that "[t]here [was] no significant change between these" images and concluded that Harrison "obviously had a preexisting herniated disk in his back which is now symptomatic by history."[92] Dr. Bartholomew further attributed the aggravation of

---

[87] Defs.' Ex. 16: Cenac Ltr., Feb. 15, 2006.

[88] Testimony of Dr. Christopher Cenac.

[89] *Id.*

[90] Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Jan. 10, 2006.

[91] *Id.*

[92] *Id.*; Testimony of Dr. Bradley Bartholomew.

26

Harrison's back to the stanchion post falling on Harrison.[93] Dr. Bartholomew also discussed the lumbar fusion procedure with Harrison, and Harrison indicated that he wished to have the operation.[94] Dr. Bartholomew saw Harrison in his office twice more on April 18 and May 18, 2006, at which times Harrison reported symptoms of back pain and radicular pain similar to those that Dr. Bartholomew had noted earlier.[95]

On October 23, 2006, Dr. Bartholomew performed a two-level posterior lumbar interbody fusion with the insertion of pedicle screws on Harrison at Omega Hospital in Metairie, Louisiana.[96] After the operation, Harrison's symptoms improved, but he still experienced intermittent pain in his lower extremities.[97] Dr. Bartholomew also found that Harrison continued to display slight sensory deficits in his left big toe.[98]

---

[93] Testimony of Dr. Bradley Bartholomew.

[94] *Id.*

[95] *Id.*; Pl.'s Ex. 5: Progress Note, Apr. 18, 2006; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, May 18, 2006.

[96] Testimony of Dr. Bradley Bartholomew; Testimony of Christopher Harrison.

[97] Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Dec. 7, 2006.

[98] Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Nov. 2, 2006; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Dec. 7, 2006.

Considering the live testimony at trial and the evidence submitted by the parties, the Court finds that Harrison's herniated discs and back condition were at least aggravated when the stanchion post fell on him on May 19, 2005. The Court credits Dr. Bartholomew's conclusion that the accident caused Harrison's injury.[99] Diamond's medical expert, Dr. Cenac, agrees that the accident likely aggravated Harrison's pre-existing disc injuries. Furthermore, both doctors agree that the EMG/NCS test results were consistent with L5 radiculopathy. Accordingly, the Court concludes that the accident of May 19, 2005 caused injury to Harrison's back.

The parties' medical experts disagree over whether Harrison's surgery was medically appropriate. Under the Jones Act, "a seaman is entitled to recovery . . . if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335. Under the general maritime law, a seaman is entitled to receive proper medical treatment and care, and the employer has a duty to provide such care up until the point that "it is probable that further treatment will result in no betterment of the claimant's condition." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). Whether an operation

---

[99] Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Oct. 16, 2007.

will improve an individual's condition or whether an individual
has reached the point of maximum medical improvement is a medical
question. *See Rashidi v. Am. President Lines*, 96 F.3d 124, 128
(5th Cir. 1996) (citing *Breese v. AWI, Inc.*, 823 F.2d 100, 104
(5th Cir. 1987)). Dr. Cenac testified that surgery would not
improve Harrison's condition because, in his opinion, Harrison
did not sustain an acute injury as a result of the accident. Dr.
Bartholomew, however, concluded that surgery was appropriate
because of Harrison's continuing symptoms of pain.

The Court finds that the fusion operation performed by Dr.
Bartholomew was necessitated by the accident and was reasonably
necessary to improve Harrison's back condition. Harrison's back
was asymptomatic before the accident.[100] For roughly a year and a
half after the accident, Harrison consistently reported symptoms
of back pain and numbness and radicular pain in his lower left
extremities. The EMG/NCS test confirmed the probable existence of
radiculopathy. The progressively tighter work restrictions that
Dr. Bourgeois placed on Harrison corroborate that Harrison's
symptoms grew worse over time. The sensations of pain he
described to Dr. Bartholomew were consistent with test results
and corresponded with symptomatic herniated discs at L4-L5 and

---

[100] Testimony of Christopher Harrison; Testimony of Kayla
Harrison.

L5-S1.[101] After having the surgery, Harrison reported that his symptoms had significantly improved, although he still experienced some residual pain. An individual's sensation of pain is inherently subjective, but credible evidence shows that Harrison experienced increasing pain associated with herniated discs after the accident and that he obtained relief after having undergone surgery. Thus, the Court finds that the spinal fusion was medically necessary to improve Harrison's back condition caused by the accident of May 19, 2005 and that it in fact improved his condition.

    2.   *Harrison's Neurogenic Bladder and Bowel Disorder and Neurogenic Erectile Dysfunction*

Harrison contends that he also developed a neurogenic bladder and bowel disorder and neurogenic erectile dysfunction as a result of the May 19, 2005 accident. Harrison contends that starting shortly after the accident, he has experienced an increase in urinary frequency and bowel movements and increasing urge to urinate.[102] And he claims that he is unable to obtain and maintain an erection. Although Harrison alleges that he experienced these symptoms immediately after the accident, he did not report any of these problems to the physicians at the

---

[101] Testimony of Dr. Bradley Bartholomew.

[102] Testimony of Christopher Harrison.

Occupational Medical Centers of West Jefferson who treated him while he was still employed with Diamond. Nor did he report these symptoms to David Ellingburg, Diamond's claims representative who interviewed Harrison on July 11, 2005 about his injuries resulting from the accident, or to Dr. Bartholomew during his first two visits on August 10 and November 10, 2005, respectively. At Harrison's August 10, 2005 consultation with Dr. Bartholomew, Dr. Bartholomew asked Harrison to complete a questionnaire about his medical history and current symptoms. One of the questions specifically asked whether Harrison was experiencing any problems with his bladder or bowels, and another asked him whether he was experiencing any sexual problems. Harrison answered "No" to both questions.[103] Indeed, Dr. Bartholomew expressly noted after Harrison's initial visit on August 9, 2005, that Harrison had "no bladder or bowel dysfunction."[104] Harrison did not discuss any bowel, bladder, and erectile dysfunction problems with Dr. Bartholomew until nearly eight months after the accident at his January 10, 2006 visit,[105]

---

[103] *Id.*

[104] Pl.'s Ex. 5, August 10, 2005 Office Note of Dr. Bradley Bartholomew.

[105] Testimony of Christopher Harrison; Testimony of Dr. Bradley Bartholomew; Pl.'s Ex. 5: Office Note signed by Dr. Bradley Bartholomew, Jan. 10, 2006.

and he did so only after having a conversation about them with his lawyer.[106]

Harrison's attorney referred him to Dr. Susan McSherry, a urologist. Dr. McSherry first examined Harrison on March 13, 2006.[107] Harrison complained of bladder problems, including the need to urinate frequently and feeling a frequent urge to urinate, as well as erectile dysfunction. Based on Harrison's age and his statement that he experienced the onset of his symptoms shortly after the May 19, 2005 accident, Dr. McSherry made a preliminary diagnosis that Harrison suffered from neurogenic bladder dysfunction and neurogenic erectile dysfunction as a result of the accident.[108] Dr. McSherry explained that she associated Harrison's bladder dysfunction with the accident because he reported to her that within several days of the accident he noticed that he had urge incontinence and had to urinate much more frequently than he had before the accident.[109] Dr. McSherry concluded that Harrison's back injuries resulted in his bladder and erectile dysfunction because disc herniation at

---

[106] Testimony of Christopher Harrison.

[107] Testimony of Dr. Susan McSherry.

[108] *Id.*

[109] *Id.*

L4-L5 and L5-S1 can be associated with these types of conditions.[110]

On June 22, 2006, Dr. McSherry performed a urodynamics study on Harrison, which involved filling his bladder through a catheter to test his bladder capacity before feeling the urge to urinate. According to Dr. McSherry, the results showed that Harrison was capable of holding about half as much fluid as most people could.[111] Dr. McSherry also explained that during the urodynamics study, she measured Harrison's bulbocavernous reflex (BCR). The BCR test measured the reflex of his rectal sphincter and the function of sacral nerve number 2 — the nerve that controls the bladder.[112] Her notes and report indicated that Harrison's BCR was absent or abnormal[113] and that he suffered from probable detrusor sphincter dyssynergia (DSD).[114] Dr. McSherry, however, did not produce the "tracings data" from her urodynamics study as requested by Diamond.[115]

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] Pl.'s Ex. 7: Office Visit Note signed by Dr. Susan McSherry, June 22, 2006; Pl.'s Ex. 7: Report of Dr. Susan McSherry, July 18, 2006.

[115] Testimony of Dr. Susan McSherry.

Dr. McSherry also ruled out hormonal causes of Harrison's alleged erectile dysfunction based on results from two tests of Harrison's testosterone levels.[116] Harrison's first testosterone sample collected on the afternoon of July 5, 2006 showed that he had a testosterone level of 167 nanograms,[117] which Dr. McSherry noted as being low and prescribed a second test.[118] Harrison's second testosterone sample, collected on the morning of December 8, 2006, reflected a testosterone level of 296 nanograms,[119] which Dr. McSherry described as normal.[120] However, she did not state what a normal range of testosterone level for a male in his late twenties is.

In February 2007, Dr. McSherry prescribed that Harrison undergo a nocturnal penile tumescence (NPT) test at home using a "Rigiscan" recording device. The NPT test measures the frequency and intensity of involuntary erections that a male patient experiences during sleep. Dr. McSherry testified that no one

---

[116] *Id.*

[117] Pl.'s Ex. 7: Results of Harrison's July 5, 2006 Testosterone Test.

[118] Pl.'s Ex. 7: Office Visit Note signed by Dr. Susan McSherry, Dec. 7, 2006.

[119] Pl.'s Ex. 7: Results of Harrison's Dec. 8, 2006 Testosterone Test.

[120] Pl.'s Ex. 7: Office Visit Note signed by Dr. Susan McSherry, Feb. 15, 2007; Testimony of Dr. Susan McSherry.

knows for certain whether NPT test results are reliable if there is no way to verify that the patient experienced rapid eye movement (REM) sleep during the test.[121] Harrison took the NPT test on two nights at home and not under laboratory conditions in which his sleep was monitored.[122] Harrison and Dr. McSherry testified that Harrison suffered insomnia and the he frequently slept only four to five hours per night.[123] Dr. McSherry also confirmed that the NPT test did not test for REM sleep.[124]  Based on the data collected by the Rigiscan, Dr. McSherry diagnosed Harrison with erectile dysfunction, and in light of his accident history and the other tests that she performed on Harrison, Dr. McSherry concluded that the cause of Harrison's erectile dysfunction was neurogenic and resulted from trauma to the controlling nerves from the accident.

Despite Dr. McSherry's findings, Harrison has failed to carry his burden of showing by credible evidence that the May 19, 2005 accident caused any bladder, bowel, or erectile problems he might be suffering. Harrison's wife could not recall that Harrison experienced an increase in bowel movements after the

---

[121] Testimony of Dr. Susan McSherry.

[122] Testimony of Christopher Harrison.

[123] *Id.*; Testimony of Dr. Susan McSherry.

[124] Testimony of Dr. Susan McSherry.

accident, which contradicted Harrison's testimony.[125] Harrison did not report any of these problems until nearly eight months after the accident. Not only did he not report these ailments, but he also expressly denied suffering from them to his own physician. When Dr. Bartholomew asked Harrison whether he experienced any of these problems at Harrison's August 10, 2005 visit, Harrison answered "No." Harrison testified that he responded negatively to these queries because he did not know those conditions could be related to his back injury.[126] Harrison claims that he did not report these problems to anyone else because he was embarrassed by his condition. Further, Harrison says he thought that he might be experiencing erectile dysfunction because he was no longer attracted to his wife.[127]

The Court does not find Harrison's testimony credible. Harrison testified in his deposition that since the accident he has had extramarital affairs with as many as five or six women.[128] At trial, he unconvincingly revised that number to "maybe two or three," stating that during his deposition he confirmed that he had affairs with more women because he just wanted defense

---

[125] Testimony of Kayla Harrison.

[126] Testimony of Christopher Harrison.

[127] *Id.*

[128] *Id.*

counsel to "move on."[129] Harrison knew that he was under oath at his deposition, and there is no indication that he ever attempted to correct his deposition statement before trial. Moreover, Harrison testified at trial that he had affairs with women he knew or women who were already attracted to him, but curiously he could not recall the names of his sexual partners or where those liaisons took place.[130] Harrison further testified at trial that he was unable to obtain an erection during those encounters.[131] He did not state in his deposition that he was unable to engage in actual intercourse with those women. In that setting, Harrison merely testified that he had extramarital affairs with multiple women. The Court finds Harrison's revisionist take on his sexual wherewithal to be unbelievable. Moreover, Harrison's claim that he was too embarrassed to disclose his alleged erectile dysfunction in a confidential physician-patient relationship when he was explicitly asked does not jibe with his willingness to reveal his supposed impotence to a half-dozen women whom he knew from his relatively small community. Harrison would have the Court believe that he concealed his erectile dysfunction from his treating physician who specifically inquired about it, but

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

simultaneously exposed it to multiple sexual partners as part of a self-conducted experiment to test whether his wife's failure to arouse him was the root of his problems. That Harrison had repeated affairs casts serious doubt on whether he experienced erectile dysfunction at all. Further, he did not need to conduct affairs with multiple women in order to eliminate his wife as the cause of his problems. Surely, one assignation would be sufficient for Harrison to determine whether his problem was anatomical as opposed to emotional. Considering the contradictions in Harrison's testimony and the implausibility of his explanation, the Court accords Harrison's testimony as to his urinary, bowel, and erectile dysfunction no weight.

Also damning to Harrison's claims are the expert opinions of Dr. Bartholomew and Dr. Neil Baum, a urologist of 35 years who performed an independent medical exam on Harrison at Diamond's request. Both doctors testified that Harrison's back injuries were likely not serious enough to result in neurogenic bladder, bowel, and erectile disorders. Dr. Bartholomew testified that it is within the purview of a neurosurgeon to testify whether a disc bulge is large enough to cause bladder, bowel, and erectile dysfunction.[132] Dr. Bartholomew opined that Harrison's disc herniation at L4-L5 and L5-S1, although significant in size, were

---

[132] Testimony of Dr. Bradley Bartholomew.

not large enough to produce neurogenic bladder, bowel, and erectile dysfunction.[133] Such complications, he testified, are usually the result of acute and severe trauma, not the kind of smaller herniation that Harrison suffered.[134]

Dr. Baum examined Harrison on May 8, 2006.[135] He recommended that Harrison undergo a hormonal evaluation to test his testosterone level and his glucose level to rule out diabetes and that Harrison take an NPT test to test for involuntary nocturnal erections.[136] Dr. Baum also recommended that Harrison undergo a urodynamic evaluation to test his bladder dysfunction.[137] With respect to the NPT, Dr. Baum testified that the conditions under which Harrison conducted the test on himself undermined the reliability of the results. He explained that in order for the results of an NPT test to be valid, the patient has to enter REM sleep and that the only way to determine with a reasonable degree of certainty that the patient enters REM sleep is to monitor the

---

[133] *Id.*; Pl.'s Ex. 5, May 18, 2006 Office Note of Dr. Bradley Bartholomew.

[134] Testimony of Dr. Bradley Bartholomew.

[135] Testimony of Dr. Neil Baum.

[136] *Id.*

[137] *Id.*

patient's electroencephalogram (EEG) patter of sleep.[138] Entering
REM sleep is critical to the utility of the NPT test because, as
Dr. McSherry testified, the NPT test is used to rule out
psychological causes of erectile dysfunction. Unless the patient
is in REM sleep, psychological factors can suppress erections.[139]
Thus, Dr. Baum testified, the NPT test should be monitored to
ensure that the test subject enters REM sleep.[140] Dr. Baum also
pointed out that there was no confirmation that Harrison had
stopped taking medications for at least seven days before he
performed the NPT test on himself at home, a necessary condition
for the test to be accurate.[141] In addition, Harrison testified
that the nurses in Dr. McSherry's office who instructed him on
how to self-administer the NPT test did not understand how the
Rigiscan worked.[142] The Court finds that Harrison's taking this
test in an uncontrolled, unmonitored environment casts serious
doubts on the reliability of the NPT test results.

Dr. Baum further testified that in his view it would be odd
for a patient not to report bowel and bladder problems on a first

---

[138] *Id.*

[139] Testimony of Dr. Susan McSherry.

[140] Testimony of Dr. Neil Baum.

[141] *Id.*

[142] Testimony of Christopher Harrison.

doctor's visit and wait for nearly eight months to report such problems.[143] His testimony also cast doubt on the reliability of Dr. McSherry's conclusions about the urodynamics study that she performed on Harrison. Dr. Baum opined that it would be highly unlikely for an individual who suffers from neither paraplegia nor quadriplegia to have detrusor sphincter dyssynergia (DSD),[144] which Dr. McSherry diagnosed as probable in Harrison's case. DSD is a condition in which the bladder sphincter muscle spasms instead of relaxes, which relaxation is necessary to allow urine to flow from the bladder.[145] Dr. Baum also testified that he had treated thousands of individuals who have difficulty urinating, and he never has found DSD in anyone who did not suffer from paraplegia or quadriplegia.[146] And Dr. Baum explained that if the bulbocavernous reflex is absent or abnormal, as Dr. McSherry found in Harrison's situation, that it is highly unlikely that someone would have DSD.[147] On the contrary, he testified, if someone suffers from DSD, then that individual would most likely

---

[143] Testimony of Dr. Neil Baum.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

have spasms of the rectal sphincter as well.[148] Dr. Baum's
testimony that it is highly unlikely for someone without a
divided spinal cord to suffer DSD and that it is equally unlikely
for someone to have an absent BCR yet experience DSD directly
contradicts Dr. McSherry's findings. In the absence of any
explanation about why Harrison's physiology would yield
contradictory test results, the Court does not find Dr.
McSherry's findings credible.

Finally, Dr. Baum testified that tests of Harrison's
testosterone levels revealed that he had testosterone at the
lower limit of normal, which could adversely affect his ability
to have erections.[149] Dr. Baum explained that an individual
Harrison's age should have a testosterone level of between four
hundred and five hundred nanograms.[150] One test indicated that
Harrison had a below normal testosterone level of only 167
nanograms. A second test showed that he had a very low normal
testosterone level of 296 nanograms.[151] Dr. Baum explained that
because Harrison's testosterone level was much lower than would

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

be expected, his hormonal level might account for the erectile dysfunction from which he claimed to suffer.[152]

Harrison has failed to show that it is more likely than not that his accident aboard the *Ocean Champion* resulted in his suffering bladder, bowel, and erectile problems. Harrison did not report these problems until nearly eight months after the accident, despite having been directly asked about them by his physician. Dr. McSherry's examinations and tests failed to reliably establish that Harrison suffers neurogenic bladder disorder and neurogenic erectile dysfunction caused by the accident. In light of Harrison's wife not recalling that her husband had bowel problems, Harrison's low testosterone level, Dr. Bartholomew's view that Harrison's disc herniations were too small to cause the alleged neurogenic disorders, flaws in the NPT test, the absence in Harrison of disabling conditions usually associated with neurogenic bladder disorder and neurogenic erectile dysfunction, and his own incredible testimony on the subject, the Court finds that the May 19, 2005 accident did not cause Harrison's alleged bladder, bowel, and erectile problems.

3.   *Harrison's Depression*

Harrison claims that he suffers from depression as a result of the accident and that he requires sustained mental health

---

[152]   *Id.*

43

counseling for at least ten months and possibly years, along with antidepressant medication before he reaches MMI. Harrison testified that since the accident he has been despondent and generally sad.[153] His back pain and resulting disability, his alleged urinary, bowel, and erectile disorders have strained his marriage and lowered his self-esteem, he contends.

The Court determines that Harrison has failed to prove by credible evidence that he suffers from accident-related depression that has prevented him from reaching MMI and that requires continuing treatment. At the outset, the Court notes that Harrison did not seek a diagnosis of mental disability from a mental health professional until nearly two and a half years after the May 19, 2005 accident and nearly a year after his back operation. When he finally underwent psychiatric evaluations in preparation for trial, two of the three mental health experts that examined him found that his exaggeration scale was so high that it rendered his psychiatric tests uninterpretable. On October 11, 2007, with his expert report deadline of October 19 looming, Harrison visited Harry Lawson, Ph. D., a clinical psychologist in Montgomery, Alabama, for approximately three hours.[154] Dr. Lawson reviewed Harrison's medical history and

---

[153] Testimony of Christopher Harrison.

[154] Pl.'s Ex. 12: Psychological Evaluation Report of Christopher Harrison signed by Harry Lawson, Oct. 12, 2007; Dep.

deposition, conducted a diagnostic interview, and administered two exams on Harrison: the Minnesota Personality Inventory, Revised (MMPI-2) and the Wechsler Adult Intelligence Scale, Revised (WAIS-R). Dr. Lawson noted that Harrison's "mood and affect appears normal though he complains of depression."[155] Dr. Lawson further observed that the results of Harrison's MMPI test were "not helpful" because the results of the F scale, which are indicative of the validity of the patient's test answers, were highly elevated.[156] Dr. Lawson explained that Harrison displayed a tendency to "endorse unusual items in the pathological direction which in turn caused scores on the clinical scales to also be elevated. In other words, [he showed] pathology across too many categories."[157] Based on these skewed test results, Dr. Lawson opined that Harrison was exaggerating his symptoms.[158] With that not so favorable opinion in hand, Harrison then sought a second opinion from Dr. Clemmie Palmer, a psychiatrist in Montgomery, on October 19, 2007.[159] Dr. Palmer reviewed Harrison's history, Dr.

---

of Harry Lawson.

[155] Pl.'s Ex. 12.

[156] Pl.'s Ex. 12; Dep. of Harry Lawson.

[157] Pl.'s Ex. 12.

[158] Pl.'s Ex. 12.

[159] Pl.'s Ex. 13: Report on Psychiatric Examination of Christopher Harrison signed by Dr. Clemmie Palmer, Oct. 19, 2007.

Lawson's report and Harrison's personal history and interviewed Harrison for an hour.[160] Despite having Dr. Lawson's report and acknowledging the validity of MMPI tests, Dr. Palmer reached the conclusion based on his interview that Harrison was not exaggerating his symptoms.[161] Roughly a month later on November 14, 2007, Harrison underwent a third psychiatric evaluation, this time a two-hour interview with Diamond's expert, Dr. John Thompson, a professor of psychiatry at Tulane University in New Orleans.[162] Dr. Thompson reviewed Harrison's history, the two earlier evaluations, Harrison's MMPI results, and interviewed Harrison. Like Dr. Lawson, he concluded that Harrison was exaggerating his symptoms on the MMPI, based on Harrison's "extremely elevated" score on the F scale.[163]

The Court finds that the weight of the credible evidence indicates that Harrison was exaggerating his depressive symptoms. Two out of the three mental health professionals concurred that his MMPI results were indicative of exaggeration. This is

---

[160] Dep. of Dr. Clemmie Palmer at 52.

[161] Dep. of Clemmie Palmer at 52-54.

[162] Defs.' Ex. 19: Civil Forensic Evaluation of Christopher Harrison signed by Dr. John Thompson, Nov. 26, 2007; Testimony of Dr. John Thompson.

[163] Defs.' Ex. 19; Testimony of Dr. John Thompson.

consistent with the Court's observation of Harrison's behavior.
As the Court noted, *supra*, Harrison at times tailored his
testimony to the exigencies of his litigation position. In
addition, the only expert who concluded that Harrison did not
exaggerate his symptoms was Dr. Palmer, who conducted the
briefest of examinations and was retained by Harrison after his
first psychiatric expert gave an opinion less than favorable to
his litigation position, and after Dr. Bartholomew cleared him to
return to work.

Harrison's own behavior also belies his reports of
depressive symptoms. He volunteered hundreds of hours at his
son's school and assumed a leadership role in the parents'
committee, of which he was elected president.[164] His ability to be
socially engaged and to remain focused on goal-directed activity
is further demonstrated by his engaging in fundraising for his
son's school, an activity that he organized.[165] He engaged in all
of this activity during the same period in which he claims to
have been socially withdrawn.[166]

---

[164] *Id.*; Pl.'s Ex. 20: Letters from Elba Head Start.

[165] Testimony of Christopher Harrison; Testimony of Kayla
Harrison.

[166] *See* Pl.'s Ex. 20: Elba Head Start Letters, Jan. 10, 2007,
Sept. 10, 2007.

Harrison's delay in seeking a mental health evaluation until just before litigation deadlines expired casts doubt on his claim that the accident caused him to be depressed. Despite Harrison's alleging that he has been depressed since the accident, there is no indication that he sought professional mental health treatment other than to gather evidence of his damages for trial. Harrison has not sought the treatment that he claims he needs since seeing the three experts who evaluated him.

To the extent that the evaluating mental health professionals thought that Harrison experienced any form of depression, their opinions are based on his subjective reports of symptoms, which the Court has found not to be credible. In any event, Dr. Lawson agreed that Harrison was not suffering from a debilitating depression, and he did not opine that Harrison's mental condition prevented him from returning to work. Further, Dr. Thompson agreed that Harrison did not suffer from a significant depression, and he believed that Harrison's mood was simply affected adversely by the stress of litigation, which would evaporate when the litigation ended. He found that there was no psychiatric reason why Harrison could not return to work and opined that doing so would actually benefit his mental state.[167]

---

[167] Defs.' Ex. 19; Testimony of Dr. John Thompson.

48

Considering all of the submitted evidence and live testimony, the Court finds that Harrison has failed to carry his burden that he suffers from depression triggered by the accident for which he needs continuing treatment.

## I.  Harrison's Maintenance and Cure

Seamen have a right to maintenance and cure for injuries that they suffer in the course of their service on a vessel, regardless of whether the shipowner was at fault or the vessel unseaworthy. *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42 (1943); *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995). "Maintenance" is the right of a seaman to food and lodging if he becomes injured during the course of fulfilling his duties to the ship. *See Guevara*, 59 F.3d at 1499. "Cure" is the right to necessary medical services. *Id.* Before a plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman; (b) that his illness or injury occurred, was aggravated or manifested itself while in the ship's service; (c) the wages to which he may be entitled; and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging. *See Foster v. Brian's Trans. Serv., et al.*, 1993 WL 114528, at *2 (E.D. La. Apr. 8, 1993) (citing Martin Norris, 2 *The Law of Seamen* § 26.21 at 53 (Supp. 1992)). Here,

49

Harrison was injured while working as a roustabout for Diamond on one of its rigs that was engaged in a drilling operation in the Gulf of Mexico. Accordingly, the Court finds that he qualifies to receive maintenance and cure payments for his injuries.

Maintenance and cure may be awarded "even where the seaman has suffered from an illness pre-existing his employment." *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir. 1968). However, there is a "general principle that it will be denied where he knowingly or fraudulently conceals his illness from the shipowner." *Id.*; *Bodden v. Professional Divers of New Orleans, Inc.*, 2001 WL 1223589, at *2 (E.D. La. Oct. 12, 2001). Specifically, when the shipowner requires a prospective seaman to undergo a pre-hiring medical evaluation, and the seaman either intentionally misrepresents or conceals material medical facts, then the seaman is not entitled to an award of maintenance and cure. *See McCorpen*, 396 F.2d at 549. For a shipowner or employer to rely on this legal defense, known as the *McCorpen* defense, to deny the seaman's maintenance and cure claim, the employer must establish: (1) that the seaman-plaintiff has intentionally misrepresented or concealed medical facts; (2) the misrepresented or concealed facts were material to the employer's hiring decision; and (3) there exists a causal link between the pre-existing disability that was concealed and the disability

50

incurred during the voyage. *Id. See also Brown v. Parker Offshore Drilling*, 410 F.3d 166, 171 (2005). Here, the Court concludes that Diamond has failed to establish that Harrison concealed any earlier, material injuries.

As discussed, *supra*, Harrison underwent a pre-employment physical examination at the Occupational Medical Center of West Jefferson before he began to work for Diamond as a roustabout. His pre-employment physical included completing a questionnaire about his medical history and an MRI scan of his back. Again, Harrison answered "No" to each of the following questions:

1. Do you have a history of back surgery?

2. Do you have any weakness in your lower extremities?

3. Do you have any sensory changes such as numbness/tingling in your lower extremities?

4. Do you have a history of trauma involving your back?

5. Do you have any problems involving your bowel or bladder?

6. Do you presently have back pain?[168]

Diamond argues that Harrison did not answer these questions truthfully and that he withheld information about injuries that he suffered as a result of his ATV and motorcycle accidents in 2000 and 2002, respectively.

---

[168] Pl.'s Ex. 4, April 1, 2005 Back Screening Questionnaire.

In *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166 (2005), the Fifth Circuit embraced the view that "the intentional concealment prong is essentially an objective inquiry." *Id.* at 174. The court in *Brown* explained that *McCorpen* "lends itself to the objective interpretation of concealment" because the *McCorpen* court emphasized that whether the seaman "'believed in good faith he was fit for duty'" is irrelevant to the issue of determining whether a seaman deliberately conceals information about a pre-existing condition that the *employer* deems important. *Id.* at 174 (quoting *McCorpen*, 396 F.3d at 549)).

The Court has no difficulty concluding here that Harrison's answers to pre-employment questionnaire were truthful. There is nothing in the record to suggest that Harrison had ever had back surgery, experienced weakness or tingling in his lower extremities, had bowel and bladder problems, or was experiencing back pain when he responded to the pre-employment questionnaire. Nor is there credible evidence that supports Diamond's contention that Harrison had a history of trauma involving his back. Although Harrison was involved in motor vehicle accidents, Harrison did not suffer any traumatic back injuries as a result of these accidents. Harrison's medical records from the 2000 and 2002 accidents include notations from examining radiologists that Harrison did not suffer any broken bones at that "veretbral body

heights and disc spaces appear well maintained."[169] Harrison broke his finger, hurt his ankle and right shoulder, and bruised his ribs in the 2002 motorcycle accident. Harrison's pre-employment medical records indicate that he disclosed the injuries from that accident, as they note that Harrison had a broken left finger.[170] But conspicuously absent from these records is any mention of a traumatic back injury. Indeed, the evaluation of Diamond's own expert, Dr. Cenac, belies the notion that Harrison somehow concealed earlier back trauma. Dr. Cenac opined that Harrison did not have an acute disc herniation but rather that he suffered from chronic, degenerative disc disease as revealed by his pre-employment MRI furnished to Diamond. Thus, Diamond has failed to show that Harrison deliberately concealed that he had herniated discs in his lower back or any other history of back trauma.

More significantly, Diamond's examining physicians evaluated the condition of  Harrison's back. In addition to gathering self-reported medical information from Harrison, the physicians evaluating Harrison's fitness for duty also took an MRI scan of Harrison's back. That MRI showed that Harrison had a dessicated

---

[169] Defs.' Ex. 27: Apr. 1, 2007 Radiological Consultation Report of Dr. Vincent E. Martin.

[170] Pl.'s Ex. 3: Diamond Offshore, Certificate of Medical Examination, Apr. 1, 2005.

and global bulging disc at L5-S1.[171] Based on his personal
examination of Harrison, Dr. Brian Bourgeois, Diamond's medical
examiner, certified that Harrison met the physical requirements
to work as a roustabout.[172] Diamond had the MRI results of
Harrison's back condition, and Diamond's own medical expert, Dr.
Christopher Cenac, opined that there was little to distinguish
Harrison's back condition between his pre-employment and post-
accident MRIs. Diamond performed clinical tests not affected by
individual, subjective notions of fitness. These tests clearly
revealed that Harrison suffered from bulging discs, and Diamond's
medical examiner certified Harrison for employment. Diamond has
put forth no evidence showing that had its medical examiners
known of Harrison's 2000 and 2002 motor vehicle accidents — about
which they did not ask — they would not have approved Harrison
for employment. Accordingly, the Court finds that Diamond has
failed to prove that Harrison concealed information that Diamond
requested, lied about his medical history, or acted in a way that
prevented Diamond from evaluating his fitness for duty.

      Diamond terminated Harrison's maintenance and cure payments
as of December 13, 2005, the date on which Dr. Christopher Cenac

---

      [171] Pl.'s Ex. 3 and Defs.' Ex. 5: MRI of Louisiana, Lumbar
Spine Screen.

      [172] Pl.'s Ex. 3: Diamond Offshore, Physical Examination Form
signed by Dr. Brian Bourgeois, Apr. 4, 2005.

determined that Harrison had reached the point of maximum medical improvement (MMI).[173] But as discussed, *supra*, the Court finds that Harrison did not achieve MMI as of December 13, 2005 because the spinal fusion that he underwent on October 23, 2006 improved his condition. Harrison asserts that he has still not reached MMI because he continues to suffer from depression and will require future therapy and counseling before he reaches MMI. But as discussed, *supra*, Harrison has failed to establish that he suffers from depression resulting from the accident that requires continuing psychological treatment. The Court credits Dr. Bartholomew's testimony that as of October 16, 2007, the last office visit that Harrison had with Dr. Bartholomew, Harrison could return to work because he displayed normal strength and feeling in his back with no signs of tenderness or spasms.[174] Dr. Bartholomew testified that Harrison would suffer a 12 percent total body impairment according to the American Medical Association's guidelines and that he would likely experience flare-ups related to his back injury twice a year that would require doctor's visits.[175] He testified that although Harrison may return to work that involves sedentary or light duties, he

---

[173] Testimony of Christopher Harrison.

[174] Testimony of Dr. Bradley Bartholomew.

[175] *Id.*

should not engage in activities that involve repetitive bending,
stooping, crawling, twisting, turning, or picking up more than
20-25 pounds.[176] Dr. Bartholomew did not opine that any further
surgical treatment was necessary for the betterment of Harrison's
condition. Accordingly, the Court finds that Harrison reached
maximum medical improvement as of October 16, 2007.

## II.  DAMAGES

Under the Jones Act, a plaintiff may recover all of his
pecuniary losses. *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th
Cir. 1981), *rev'd on other grounds by Michel v. Total Transp.,
Inc.*, 957 F.2d 186, 191 (5th Cir. 1992). Pecuniary loss may
include loss of earning capacity, medical expenses, and pain and
suffering resulting from an injury caused by negligence and/or
unseaworthiness. *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp.
2d 717, 730 (E.D. La. 2004). The Court will address the elements
of damages that Harrison claims in his proposed findings of fact
and conclusions of law and in the pretrial order. Harrison
submitted an economist's report and a hodgepodge of receipts,
billing statements, and financial records in support of his
damage claims. Based on this evidence, as well as the report of

---

[176] *Id.*

Diamond's expert economist,[177] the Court makes its findings as to Harrison's damages as follows.

**A.    Past and Future Wage Loss**

*1.   Past Lost Wages*

Harrison is entitled to any wages that he would have earned had he continued to work as a roustabout through the date of trial, less (1) any wages that Diamond paid him; and (2) any wages that he could have earned despite his physical condition. *See Eugene v. Mormac Marine Transp., Inc.*, 48 F.3d 529, 1995 WL 840779, at *4 (5th Cir. 1995) (finding appropriate an award for past lost wages up to the point at which defendant could return to work); *Daigle*, 322 F. Supp. 2d at 731 (subtracting amounts earned after plaintiff's injury from his past loss); *In re Diamond B Marine Servs., Inc.*, Civ. A. No. 99-951, 2001 WL 1164914, at *18 (E.D. La. 2001) (holding that allowing recovery for wages paid by plaintiff's employer would amount to "double recovery"); *Crum v. United States*, Civ. A. No. 99-2178, 2000 WL 943253, at *3 (E.D. La. 2000) (finding that where an injury did not prevent the plaintiff from returning to work, he was not entitled to past wages). In the maritime context, an award for lost wages must be based on after-tax earnings. *See Myers v.*

---

[177] The parties stipulated to the submission of written reports by the economic experts in lieu of live testimony.

*Griffin-Alexander Drilling Co.*, 910 F.2d 1252, 1256 (5th Cir. 1990) (citing *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988)).

The Court finds that the relevant time period for calculating Harrison's past lost wages is the 26 month and two-week period from August 1, 2005 through October 16, 2007. These dates correspond to the point at which Harrison's expert economist began to calculate his past lost wages and the point at which Harrison's treating surgeon, Dr. Bartholomew, cleared him to return to light duty or sedentary work. Both Harrison and Diamond submitted expert reports from economists, calculating his past lost wages.[178] Harrison's accident occurred on May 19, 2005. Harrison, however, continued to work for Diamond for approximately two months after the accident. Harrison did not specify the exact date on which he stopped working for Diamond, but testified that he worked two more hitches aboard the *Ocean Champion* and that he stopped working for Diamond at some point in mid-to-late July 2005.[179] Harrison's economic expert calculates his past lost wages over a 30-month period from August 1, 2005 to

---

[178] Pl.'s Ex. 15: Report of Shael Wolfson, M.S., Nov. 1, 2007; Defs.' Ex. 30, Report of G. Randolph Rice, Ph. D., Nov. 20, 2007.

[179] Testimony of Christopher Harrison.

58

February 1, 2007, which is roughly the date of trial.[180] The Court accepts August 1, 2005 as the starting point for calculating Harrison's past lost wages, as it is undisputed that Harrison had ceased working for Diamond by the end of July 2005. Although Harrison has not obtained gainful employment since he stopped working for Diamond, the Court finds that the appropriate period for calculating his lost past wages ends on October 16, 2007 because Dr. Bartholomew cleared him to return to work as of that date. As discussed, *supra*, the Court has determined that Harrison did not suffer from depression that prevented him from returning to work after October 16, 2007. The Court finds that as of October 16, 2007, Harrison was no longer prevented from working.

The parties' economic experts calculated Harrison's baseline salary as being roughly the same amount. Based on Harrison's employment records and his tax forms, Harrison's expert, Shael Wolfson, calculated his pre-tax base annual salary as a roustabout at $34,150.00. Diamond's expert, Professor Randolph Rice, took into account overtime pay that Harrison likely would have received and his travel stipend in calculating Harrison's pre-tax salary at $36,178.51. Using a tax rate of nine percent, Harrison's expert calculates that Harrison's *after*-tax lost wages

---

[180] Pl's Ex. 15: Nov. 1, 2007 Report of Pl.'s Forensic Economist, Shael M. Wolfson, M.S. at 3.

during the 30-month period from August 1, 2005 to February 1, 2008 total $76,617.00.[181] Professor Rice calculates that Harrison lost a slightly higher total of $82,399.00 in past wages after taxes. Professor Rice does not specify the time period that he used to calculate Harrison's lost past wages, but considering the base salary that he used and his total calculation, the Court finds that he used the same 30-month period and a tax rate of nine percent. Professor Rice's calculation of Harrison's past lost wages is equivalent to after-tax annual earnings of $32,959.60, or $2,746.63 per month. The Court credits the estimate of Professor Rice because it takes into account Harrison's overtime pay and travel stipend, whereas Harrison's expert did not do so.[182] Multiplying the monthly after-tax equivalent of $2,746.63 by the relevant time period for calculating Harrison's lost past wages, the Court finds that Harrison has lost $72,777.75 in past wages. Accordingly, the Court awards Harrison $72,777.75 in lost past wages.

　　2.　*Future Lost Wages*

　　The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*,

---

[181] Pl's Ex. 15, Nov. 1, 2007 Report of Pl's Forensic Economist, Shael M. Wolfson, M.S. at 3.

[182] Pl.'s Ex. 15 at 4.

722 F.2d 114 (5th Cir. 1983). In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. *Id.* at 517. Any award for future lost wages in the maritime context also must be based on after-tax earnings. *Hernandez*, 841 F.2d at 587; *Culver*, 722 F.2d at 117 (stating that in calculating future lost earnings, "the fact-finder should subtract amounts that the wage earner would have been required to pay, such as income tax and work expenses"). *See also Daigle*, 322 F. Supp. 2d at 731.

Harrison's economic expert estimates that Harrison's work-life expectancy at 29.8 years, under which he would work until he is 60 years old.[183] Diamond does not offer a projection on Harrison's work-life expectancy. The Court accepts the estimate of Harrison's expert. Since Harrison became eligible to return to work as of October 16, 2007, the Court adds an additional three and half months to Harrison's future work-life expectancy for the purposes of calculating his loss of future earning capacity. Further, having credited the findings of Diamond's expert, Professor Rice, with respect to Harrison's past annual earnings,

---

[183] Pl.'s Ex. 15: Report of Shael Wolfson at 5.

the Court finds that Professor Rice's estimate to be a reliable baseline number to calculate Harrison's lost income stream.

Both Harrison and Diamond submitted reports from vocational rehabilitation experts who offered assessments of Harrison's future employment and wage prospects. Harrison's expert, Nancy Crumpton, concluded that because Harrison's earlier employment experience consisted largely of heavy duty, manual work, he would likely face some limitations in obtaining light or sedentary work but that he would still be employable.[184] She then identified a range of light/sedentary duty jobs near Harrison's home in Alabama for which Harrison might be eligible that had a median average hourly wage of $9.26.[185] Based on Crumpton's assessment and her calculation of potential jobs and salaries, Harrison's economic expert estimates that Harrison will earn annual future wages of $19,261.00.[186] Using that figure, Wolfson estimates that Harrison would suffer $225,179.00 in future lost wages. Diamond's vocational expert, Bruce Brawner, estimates that if Harrison obtained a job that involved light or sedentary duties, he would

---

[184] Pl.'s Ex. 14: Vocational Evaluation of Christopher Harrison by Nancy Crumpton, Oct. 15, 2007.

[185] Pl.'s Ex. 14: Crumpton Report at 4.

[186] Pl.'s Ex. 15: Report of Shael Wolfson at 5.

be capable of earning $22,488.00 per year.[187] He also estimates that were Harrison to obtain work involving physical duties similar to his previous jobs, Harrison would stand to earn an average of $37,833.00 annually.[188] Brawner then amended his report to include additional light duty jobs such as loan manager, insurance and automobile sales, warehouse manager, and real estate agent, and estimated that Harrison could earn more than $49,000.00 per year if employed in those jobs. The Court does not find Brawner's latter two estimates credible. The likelihood of Harrison returning to heavy duty work similar to his earlier jobs is slim to none, and it would be against his doctor's orders. Dr. Bartholomew found that Harrison suffers a 12 percent disability according to the AMA guidelines, restricted Harrison to light duty, and explained at trial that Harrison would likely aggravate his injury through demanding physical labor. And in light of Harrison's educational background and lack of demonstrated commercial managerial or sales skills, the Court does not accord weight to Brawner's third estimate. The Court does credit, however, Brawner's first estimate that Harrison would be able to obtain a job that involves light or sedentary duty and pays an

---

[187] Defs.' Ex. 16: Vocational Rehabilitation Evaluation of Christopher Harrison by Bruce Brawner, Nov. 9, 2007.

[188] *Id.*

average salary of $22,488.00. Brawner and Crumpton conducted similar aptitude and work history exams on Harrison, but Brawner explicitly takes into account the skills that Harrison developed during his nine years in the Navy, whereas Crumpton does not. Relying on Brawner's future wage estimate of $22,488.00 to offset Harrison's lost future wages that he would have earned as a Diamond roustabout and taking into account taxes and applying a discount rate of 2.0 percent to estimate present value, Professor Rice calculates that Harrison will lose $316,332.00 in future wages, which exceeds the estimate of Harrison's economic expert. The Court finds Professor Rice's estimate and the credit for returning to sedentary or light duty work credible. It also adds an additional $3,000 to account for lost future wages during the period between October 16, 2007 and the date of trial. Accordingly the Court awards Harrison $319,332.00 for future lost wages.

**B.   Pain and Suffering**

Harrison has endured pain and suffering associated with his back injury. But the Court does not consider any pain and suffering that Harrison might have suffered as a result of his alleged bladder, bowel, and erectile disorders and depression because Harrison failed to establish a causal connection between the accident and those supposed conditions. As a result of the

64

150-pound stanchion post falling on his back, Harrison's herniated discs became aggravated, and he lived in pain for a year and a half before ultimately undergoing a serious spinal operation. Harrison suffered debilitating pain before surgery.[189] And although the two-level fusion has provided him some relief, he still experiences residual radicular pain. He has been unable to engage in several physical activities that he was able to enjoy before he was injured in the May 19, 2005 accident. For instance, he can no longer complete the physical training for the Naval Reserve, and he is limited in terms of the domestic work that he can do around his house.[190] He has considered pursuing a career as a barber, but prolonged standing causes him pain.[191] His disability not only prevents him from performing manual labor but also limits his ability to lift weights and to exercise. He is unable to dance with his wife. In addition, he cannot play football or wrestle with his son or give him piggyback rides.[192] For all these reasons, the Court finds that Harrison is entitled to an award of $190,000.00 for mental and physical pain and suffering. Based on the testimony at trial, the Court apportions

---

[189] Testimony of Christopher Harrison.

[190] *Id.*

[191] *Id.*

[192] *Id.*

this amount as follows: $100,000.00 for past pain and suffering and $90,000.00 for future pain and suffering.

### C.    Past and Future Medical Expenses

Harrison is entitled to medical expenses related to his back injuries, which were at least aggravated by the May 19, 2005 accident. He is not entitled, however, to medical expenses related to his alleged neurogenic bladder and bowel disorder and erectile dysfunction, as he has failed to show by a preponderance of the evidence that the accident that aggravated his herniated discs at L4-L5 and L5-S1 also resulted in his urinary, bowel, and erectile disorders. Accordingly, the Court has excluded Dr. McSherry's fees ($4,013.00) and those fees paid by Harrison's insurer for Dr. McSherry's care ($2,174.75) as indicated on Harrison's insurance records.[193] The billing statement for Harrison's August 9, 2005 visit to Stand-Up Open MRI Centers of Louisiana indicates a charge of $1,900.00.[194] The statements itemizing fees for Dr. Bartholomew's care total $30,281.95.[195] Thus, the Court finds that Harrison is entitled to $108,820.05 for past medical expenses, according to the following itemization:

---

[193] Defs.' Ex. 3.

[194] Pl.'s Ex. 9.

[195] Pl.'s Ex. 5.

**PAST MEDICAL EXPENSES**

| TREATMENT | COST |
|---|---|
| Treatment provided by Dr. Bradley Bartholomew | $30,281.95 |
| Treatment provided by Dr. Susan McSherry | $0.00 |
| TENS Unit prescribed by Dr. Bradley Bartholomew from Aug. 9, 2005-Nov. 5, 2006 | $3,749.00 |
| Stand-Up Open MRI | $1,900.00 |
| Medical Expenses Paid for by Blue Cross/Blue Shield (including Omega Hospital Fees for Harrison's Spinal Fusion paid less Dr. McSherry's fees of $4,300.00) | $72,889.10 |
| **TOTAL** | **$108,820.05** |

With respect to future medical expenses, the Court finds
that Harrison is entitled to payment for doctor's visits and care
related to lower back problems that he can expect in the future.
The Court finds credible Dr. Bartholomew's estimate that Harrison
will likely have to visit a doctor twice a year for the rest of
life for complications related to his back. The Court accepts the
estimate of Harrison's economic expert that such visits and
treatment will cost a total of $14,773.00 when discounted to
present value.[196] Harrison is not entitled, however, to future

---

[196] Pl.'s Ex. 15.

67

medical expenses related to his alleged bladder, bowel, and erectile disorders.

**D.   Maintenance**

A seaman injured in the course of his employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (*e.g.*, recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994). As explained, *supra*, whether the seaman or employer was negligent is irrelevant to the recovery of maintenance and cure. *Brister v. AWI, Inc.*, 946 F.2d 350, 360 (5th Cir. 1991); *Jauch*, 470 F.3d at 212. Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI. *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughn v. Atkinson*, 369 U.S. 527, 531 (1962)). Therefore, the maintenance and cure duty does not extend to treatment that is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996).

The seaman's claim for maintenance and cure lies against the seaman's employer, which in this case is Diamond Offshore

Management Company. *See Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir. 1981). If a seaman's employer willfully fails to pay maintenance and cure, the seaman may recover attorney's fees. *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1513 (5th Cir. 1995). *See also Vaughn*, 369 U.S. at 530-31; *Brown*, 410 F.3d at 177. In order to recover for a claim of maintenance and cure and attorney's fees, plaintiff bears the burden of showing that he was injured in the course of his employment aboard the vessel, the defendant failed to pay maintenance and cure and this failure was willful. *See Guevara*, 59 F.3d at 1513.

The credible evidence supports the conclusion that Harrison injured his back on May 19, 2005 when a stanchion post fell on him while he was working as a roustabout for Diamond aboard the *Ocean Champion* and that he was unfit for duty and required surgery to repair his injury. After Diamond's medical expert, Dr. Cenac, examined Harrison and Harrison's medical history, he concluded that Harrison had reached maximum medical improvement as of December 13, 2005. As explained, *supra*, however, Harrison had not reached MMI on that date as the later spinal fusion surgery improved his condition. The Court credits Dr. Bartholomew's determination that Harrison had reached the point of maximum medical cure and could return to work as of October

16, 2007. Thus, the Court concludes that Harrison is entitled to maintenance and cure from the point at which he stopped work for Diamond until October 6, 2007. Harrison never specified on what date he stopped work and started receiving maintenance payments instead of his usual paycheck. His economic expert uses July 31, 2005 as a starting point. However, in his proposed findings of fact, Harrison asserts that he is owed maintenance from approximately July 11, 2005. Because Harrison has failed to designate one starting date, the Court accepts the date used by his economic expert. A period of 807 days elapsed between July 31, 2005 and October 16, 2007.

In calculating an award for maintenance, the Court must first estimate the "plaintiff seaman's actual costs of food and lodging; and the reasonable cost of food and lodging for a single seaman in the locality of the plaintiff." *Hall v. Noble Drilling (U.S.), Inc.*, 242 F.3d 582, 590 (5th Cir. 2001). In order to recover maintenance, the seaman plaintiff must produce "evidence to the court that is sufficient to provide an evidentiary basis for the Court to estimate his actual costs." *Id.* Provided he has incurred the expense, the seaman is entitled to the reasonable cost of food and lodging. *Id.* at 587. To determine the reasonable costs of food and lodging, the Court may consider evidence of "the seaman's actual costs, evidence of reasonable costs in the

locality or region, union contracts stipulating a rate of maintenance or per diem payments for shoreside food or lodging while in the service of a vessel, and maintenance rates awarded in other cases for seamen in the same region." *Id.* at 590. "A seaman's burden of production in establishing the value of maintenance is feather light: his own testimony as to reasonable cost of room and board in the community where he is living is sufficient to support an award." *Yelverton v. Mobile Labs., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) (citing *Curry v. Fluor Drilling Servs., Inc.*, 715 F.2d 893 (5th Cir. 1983)). Lodging includes those expenses "necessary to the provision of habitable housing," including utility costs. *Hall*, 242 F.3d at 587 n.17 (citing *Gillikin v. United States*, 764 F. Supp. 270, 273 (E.D.N.Y. 1991)). However, "[a] seaman need not present evidence of the reasonable rate; a court may take judicial notice of the prevailing rate in the district." *Hall*, 242 F.3d at 590. Second, after the court calculates the plaintiffs actual costs and the reasonable costs, the Court must compare the two. "If actual expenses exceed reasonable expenses, the court should award reasonable expenses. Otherwise, the court should award actual expenses." *Id.*

Turning to Harrison's actual expenses, Harrison submitted bills for the monthly mortgage for the home that he lives in with

71

his wife and son totaling $981.00 month and utility bills from
March 2006 through March 2007 that averaged $172.11 per month.[197]
These costs amount to an average of $38.44 per day for lodging
and utilities based on a 30-day month. The Court also accepts
Harrison's meal rate of $8.00 per day, bringing Harrison
maintenance rate per day to $46.44. This total figure represents
Harrison's actual costs per month for maintenance and will not be
pro-rated due to the fact that Harrison lives with his wife and
son. *See Hall*, 242 F.3d at 589 (stating fact that seaman lives
with other members of household goes towards reasonableness of
lodging costs and not towards calculation of actual costs).

Unfortunately, the parties presented the Court will little
evidence to calculate the reasonable cost of Harrison's
maintenance. They have not stipulated to a reasonable amount of
maintenance. Harrison did not testify as to what is a reasonable
cost of food and lodging for a single seaman in Elba, Alabama.
The parties have not submitted any evidence of union contracts
with Diamond establishing a maintenance rate. No evidence was
submitted on how much Diamond paid Harrison in maintenance.
Presented with no evidence of what constitutes a reasonable rate
of maintenance, the Court looks to recent judicial decisions to
determine the prevailing reasonable rate. *See, e.g., Hall*, 242

---

[197] Pl.'s Ex. 21, 22.

F.3d at 591, 592 n.45 (upholding district court's finding that maintenance rates of $30.50 and $31.50 were reasonable amounts for single seamen and noting that a $15 per day rate awarded in 1978 is equivalent to $38.35 in 1999 dollars); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007) (finding that a maintenance rate of $30.00 per day is reasonable and appropriate in this case); *Atlantic Sounding Co. v. Curette*, Civ. A. No. 05-2810, 2006 WL 1560793, at *3 (E.D. La. May 16, 2006) (finding maintenance rate of $30.00 per day reasonable); *Lodrigue v. Delta Towing, L.L.C.*, No. Civ. A. 03-0363, 2003 WL 22999425, at *11 (E.D. La. Dec. 19, 2003) (finding $31.00 to be reasonable approximation). Considering Harrison's actual expenses and recent awards by courts in the Fifth Circuit, the Court finds that an award of $37.00 is reasonable in this case. The Court observes that the rate of $31.50 recognized as reasonable in *Hall* in 2001 would be roughly equivalent to $38.00 today. Accordingly, for the 807-day period between July 31, 2005 and October 16, 2007, Harrison is entitled to $29,859.00 for maintenance, less any amount that Diamond has already paid him.

Harrison also seeks the value of future lost meals and makes a claim for cure payments. The Court finds that he is entitled to neither. Harrison claims $50,876.00 in damages for the value of

future lost meals.[198] Because Harrison reached maximum medical improvement as of October 16, 2007, he is not entitled to the value of future lost meals. In addition, as a cure award cannot duplicate tort damages, the Court denies Harrison's cure claim. *See Boudreaux*, 280 F.3d at 469; *Brister*, 946 F.2d at 361. The Court has already awarded Harrison damages for past medical expenses, and Diamond paid for Harrison's care at the Occupational Medical Center of West Jefferson. Accordingly, he is not entitled to any cure payments.

Finally, the Court does not find that Diamond was arbitrary and capricious in terminating Harrison's maintenance and cure payments as of December 13, 2005. Upon receiving a demand for maintenance and cure, a shipowner is not required to begin payments immediately, but may undertake a reasonable investigation of the seaman's claim. *See Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987). If the owner unreasonably rejects a demand for maintenance after the investigation, then it may be liable for the maintenance as well as compensatory and punitive damages. The Fifth Circuit has recognized that in the context of an injured seaman's recovery of maintenance and cure

---

[198] Pretrial Order at 10.

74

there is an escalating scale of liability: a shipowner who
is in fact liable for maintenance and cure, but who has been
reasonable in denying liability, may be held liable only for
the amount of maintenance and cure. If the shipowner has
refused to pay without a reasonable defense, he becomes
liable in addition for compensatory damages. If the owner
not only lacks a reasonable defense but has exhibited
callousness and indifference to the seaman's plight, he
becomes liable for damages and attorney's fees as well.

*Morales*, 829 F.2d at1358. (5th Cir. 1987).

Although the Court found that Harrison is entitled to
maintenance and cure with respect to his back injury, the Court
does not find that Diamond's termination of maintenance payments
was unreasonable. Diamond paid for Harrison's medical treatment
at Occupational Medical Centers of West Jefferson in the two
months after the accident and for physical therapy near his home
in Alabama. Diamond accepted the OCM doctors' recommendations
that Harrison perform only light duty. It is not clear whether
Harrison sought for Diamond to arrange further treatment for him
after July 2005, but there is no suggestion that Diamond ever
denied such a request.

Diamond did not terminate maintenance payments without
investigating Harrison's condition. Dr. Cenac, an experienced
orthopedic surgeon, examined Harrison and his medical history. He
came to the same conclusion that Dr. Bartholomew reached:
Harrison had aggravated a pre-existing back disc herniation and
that there was not a discernible difference between Harrison's

pre-employment and post-accident MRIs in terms of spinal structure. The difference between the two doctors' evaluations was in their opinions about whether surgery would provide Harrison further relief. Diamond was not unreasonable in relying on Dr. Cenac's opinion. Accordingly, the Court finds that Diamond's termination was neither arbitrary nor capricious and denies Harrison's request for attorney's fees and punitive damages.

### F.   Reimbursement for Litigation-Related Expenses

Harrison alleges that Diamond unreasonably delayed in reimbursing him for travel and lodging expenses associated with the various independent medical exams that he underwent. There is no dispute, however, that Diamond has paid in full the expenses that plaintiff incurred for these journeys. Harrison has failed to prove by a preponderance of the evidence that Diamond unreasonably delayed in reimbursing him, as the parties' submissions indicate that plaintiff's counsel delayed in providing the requested receipts.

### G.   Pre-Judgment Interest

In admiralty, the Court has the discretion to award pre-judgment interest. There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in

bringing his action. *See United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 334 (5th Cir. 2001). When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest. *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987); *Bush v. Diamond Offshore Co.*, 46 F. Supp. 2d 515, 523 (E.D. La. 1999). It is within the discretion of the Court to select an equitable rate of pre-judgment interest. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991). The Court finds no delay here and that Harrison is thus entitled to receive pre-judgment interest at 1.77 percent, which is the most recently quoted rate for one-year constant maturity treasury bills, from the date of judicial demand (January 18, 2007) until the date of payment. Pre-judgment interest may be awarded only on damages that have actually accrued as of the date of judgment. *Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986). Accordingly, Harrison may receive pre-judgment interest only on past damages, not future damages. In this case, he is entitled to pre-judgment interest on past lost wages, past medical expenses, maintenance, and past pain and suffering.

**III. SUMMARY**

On the basis of the foregoing findings of fact and
conclusions of law, the Court finds that the plaintiff is
entitled to recover the following damages:

<u>THE COURT'S AWARD OF DAMAGES</u>

| <u>ITEM OF DAMAGES</u> | <u>AMOUNT</u> |
|---|---|
| Past Wage Loss | $72,777.75 |
| Future Wage Loss | $319,332.00 |
| Past Pain and Suffering/Mental Anguish | $100,000.00 |
| Future Pain and Suffering/Mental Anguish | $90,000.00 |
| Past Medical Expenses | $108,820.05 |
| Future Medical Expenses | $14,733.00 |
| Maintenance (less any amount already paid) | $29,859.00 |
| **TOTAL (excluding interest)** | **$735,521.80** |

Because the Court did not find Harrison contributorily
negligent, defendants will bear the entire cost of the judgment.
Harrison is entitled to pre-judgment interest on past damages
from the date of judicial demand until the date paid, and he is
entitled to post-judgment interest on all remaining damages from
the date of judgment until the date paid. Both pre- and post-

78

judgment interest is to be calculated at a 1.77 percent per annum rate.


          New Orleans, Louisiana, this <u>6th</u> day of March 2008


                    SARAH S. VANCE
               UNITED STATES DISTRICT JUDGE